Law Offices of
**MICHAEL W. CARMEL, LTD.**
80 East Columbus Avenue
Phoenix, Arizona  85012-2334
Telephone:  (602) 264-4965
Arizona State Bar No.  007356
Facsimile:  (602) 277-0144
E-mail:  Michael@mcarmellaw.com

Counsel for Debtor and Debtor-in-Possession

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ARIZONA

| In re: | Chapter 11 Proceedings |
|---|---|
|  | Case No. 2:11-31874-RTBP |
| VERDE VALLEY PLAZA , LLC, | **DISCLOSURE STATEMENT CONCERNING DEBTOR'S AMENDED PLAN OF REORGANIZATION** |
| Debtor. |  |

Verde Valley Plaza, LLC, (**"Debtor"**) filed a petition for relief under Chapter 11 of Title 11 of the United States Code (**"Bankruptcy Code"**) on November 16, 2011 ("**Petition Date**") with the United States Bankruptcy Court for the District of Arizona (**"Bankruptcy Court"**). The Debtor remains in possession of its property and continues to operate its business as debtor-in-possession in accordance with Bankruptcy Code Sections 1107 and 1108.

The Debtor has prepared this Disclosure Statement ("Disclosure Statement") in connection with the solicitation of acceptances for the Amended <u>Plan of Reorganization Proposed by Debtor</u> dated July 5, 2012 (**"Plan"**). A copy of the Plan is attached as **Exhibit 1** to this Disclosure Statement and is incorporated herein by this reference. The Debtor is the Proponent of the Plan. The Debtor's shareholders and Board of Directors unanimously support the Plan.

Capitalized terms used in this Disclosure Statement have the same meanings ascribed to those terms in the Plan and the Bankruptcy Code. Terms defined in this Disclosure Statement that are also defined in the Plan are defined herein solely for convenience, and there is no intent to change the definitions of those terms from the Plan.

### Information Regarding the Plan and Disclosure Statement

The object of a Chapter 11 case is the confirmation (i.e., approval by the Bankruptcy Court) of a plan of reorganization. A plan describes in detail (and in language appropriate for a legal contract) the means for satisfying the claims against and interests in a debtor. After a plan has been filed, the holders of such claims and interests are permitted to vote to accept or reject the plan. Before a proponent can solicit acceptances of its plan, however, Section 1125 of the Bankruptcy Code requires the proponent to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable those parties entitled to vote on the plan to make an informed judgment about the plan and about whether they should accept or reject the plan.

The purpose of this Disclosure Statement is to provide the Debtor's Creditors with adequate information to make an informed judgment about the Plan. This information includes, among other matters, a brief history of the Debtor, a summary of its Chapter 11 Case, a description of the Debtor's assets and liabilities, a description of the terms under which the Debtor's assets will be administered in accordance with the Plan, and an explanation of how the Plan will function.

It is important that Creditors read and carefully consider this Disclosure Statement and the Plan, and that such Creditors vote promptly on the acceptance of the Plan.

**YOU SHOULD READ THIS DISCLOSURE STATEMENT IN ITS ENTIRETY BEFORE VOTING ON THE PLAN. THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN TERMS OF THE PLAN, BUT THE PLAN ITSELF IS THE GOVERNING DOCUMENT. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN CONTROL.**

**IF YOU HAVE QUESTIONS CONCERNING YOUR TREATMENT UNDER THE PLAN, PLEASE CONTACT COUNSEL TO THE DEBTOR, MICHAEL W. CARMEL, MICHAEL W. CARMEL, LTD., 80 EAST COLUMBUS AVENUE, PHOENIX, ARIZONA 85012, TELEPHONE NUMBER (602) 264-4965, FAX NUMBER (602) 277-0144, E-MAIL: MICHAEL@MCARMELLAW.COM.**

A SUMMARY DESCRIPTION OF THE CLASSIFICATION OF THE CLAIMS AND THE TREATMENT PROPOSED UNDER THE PLAN ARE CONTAINED UNDER CLASSIFICATION AND TREATMENT UNDER THE PLAN.

THE PROPONENTS RESERVE THE RIGHT TO AMEND, MODIFY, OR SUPPLEMENT THE PLAN AT ANY TIME BEFORE THE CONFIRMATION OF THE PLAN, PROVIDED THAT SUCH AMENDMENTS OR MODIFICATIONS DO NOT MATERIALLY ALTER THE TREATMENT OF, OR DISTRIBUTIONS TO, CREDITORS UNDER THE PLAN.

THE FINANCIAL PROJECTIONS CONTAINED IN THIS DISCLOSURE STATEMENT REPRESENT THE DEBTOR'S ESTIMATES OF FUTURE EVENTS BASED ON CERTAIN ASSUMPTIONS MORE FULLY DESCRIBED BELOW, SOME OR ALL OF WHICH MAY NOT BE REALIZED. NONE OF THE FINANCIAL ANALYSES CONTAINED IN THIS DISCLOSURE STATEMENT ARE CONSIDERED TO BE A FORECAST OR PROJECTION AS TECHNICALLY DEFINED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS. THE USE OF THE WORDS, "FORECAST", "PROJECT", OR "PROJECTION" WITHIN THIS DISCLOSURE STATEMENT RELATE TO THE BROAD EXPECTATIONS OF FUTURE EVENTS OR MARKET CONDITIONS AND QUANTIFICATIONS OF THE POTENTIAL RESULTS OF OPERATIONS UNDER THOSE CONDITIONS.

ALL FINANCIAL INFORMATION PRESENTED IN THIS DISCLOSURE STATEMENT WAS PREPARED BY THE DEBTOR AND REVIEWED BY THE COMMITTEE. EACH CREDITOR IS URGED TO REVIEW THE PLAN IN FULL BEFORE VOTING ON THE PLAN TO ENSURE A COMPLETE UNDERSTANDING OF THE PLAN AND THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT IS INTENDED FOR THE SOLE USE OF CREDITORS, SHAREHOLDERS AND OTHER PARTIES-IN-INTEREST, AND FOR THE SOLE PURPOSE OF ASSISTING THEM IN MAKING AN INFORMED DECISION ABOUT THE PLAN. NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS IN CONJUNCTION WITH THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT OR IN THE BALLOTS. IF GIVEN OR MADE, ANY SUCH INFORMATION OR REPRESENTATIONS MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTOR OR THE COMMITTEE.

THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT. THE BANKRUPTCY COURT WILL CONSIDER ANY OBJECTIONS TO AND DETERMINE THE LEGAL ADEQUACY OF THIS DISCLOSURE STATEMENT IN CONJUNCTION WITH CONFIRMATION OF THE PLAN. APPROVAL OF THE LEGAL ADEQUACY OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT IS NOT A CERTIFICATION BY THE BANKRUPTCY COURT AS TO THE TRUTH OR ACCURACY OF THE FACTUAL MATTERS THAT ARE CONTAINED IN THIS DISCLOSURE STATEMENT.

THE DEBTOR STRONGLY URGES YOU TO VOTE FOR THE PLAN AS IT BELIEVES THAT THE PLAN WILL PROVIDE FOR A SIGNIFICANTLY

3

**LARGER DISTRIBUTION TO HOLDERS OF CLAIMS THAN WOULD OTHERWISE RESULT IF AN ALTERNATIVE RESTRUCTURING PLAN WERE PROPOSED OR THE DEBTOR'S ASSETS WERE LIQUIDATED UNDER CHAPTER 7 OF THE BANKRUPTCY CODE.**

This Disclosure Statement has not been subject to a certified audit but has been prepared in part from the information compiled by the Debtor from records maintained by it in the ordinary course of business or from information received by the Debtor from third parties. Every effort has been made to be as accurate as possible in the preparation of this Disclosure Statement.

Other than as stated in this Disclosure Statement, the Debtor has not authorized any representations or assurances concerning the Debtor, its operations, or the value of its assets. Therefore, in deciding whether to accept or reject the Plan, you should not rely on any information relating to the Debtor or the Plan other than that contained in this Disclosure statement or in the Plan itself. You should report any unauthorized representations or inducements to counsel for the Debtor, who may present such information to the Bankruptcy Court for action as may be appropriate.

This is a solicitation by the Debtor only and is not a solicitation by any affiliates, attorneys, agents, financial advisors, accountants, or any other professionals employed by the Debtor.

Doug Huberman, Joel Leebove and Patrick Chraghcian provided the primary information contained in this Disclosure Statement.

**SUMMARY OF CLASSIFICATION AND TREATMENT UNDER THE PLAN**

Set forth in the following section is a summary of the classification and treatment of Claims under the Plan.

The Classes of Claims against and Equity Interests in the Debtor shall be treated under the

Plan as follows:

**Unclassified Claims**

As provided in Section 1123(a)(1) of the Bankruptcy Code, Preserved Ordinary Course Administrative Claims against the Debtor are not classified for purposes of voting on, or receiving Distributions under the Plan. Holders of such Claims are not entitled to vote on the Plan. All such Claims are instead treated separately in accordance with the requirements set forth in Section 1129(a)(9)(A) of the Bankruptcy Code.

*Claims for Professional Fees.* Each Person seeking an award by the Bankruptcy Court of Professional Fees: (a) must file its final application for allowance of compensation for services rendered and reimbursement of expenses incurred through the Confirmation Date within thirty days after the Confirmation Date; and (b) if the Bankruptcy Court grants such an award, each such Person must be paid in full in Cash in such amounts as are allowed by the Bankruptcy Court as soon thereafter as practicable.

*Post-Confirmation Professional Fees.* All Professional Fees for services rendered in connection with the Chapter 11 Case and the Plan

4

after the Confirmation Date, including those relating to the prosecution of Litigation Claims preserved under the Plan and the resolution of Disputed Claims, are to be paid by the Debtor upon receipt of an invoice for such services, or on such other terms to which Debtor may agree, without the need for further Bankruptcy Court authorization or entry of a Final Order. The Debtor shall have ten days after the receipt of any such invoice to object to any item contained in such invoice. If the Debtor and any Professional cannot agree on the amount of post-Confirmation Date fees and expenses to be paid to such Professional, such amount is to be determined by the Bankruptcy Court.

## CLASS 1 – TAX and WAGE PRIORITY CLAIMS.

(a) <u>Impairment and Voting</u>. Class 1 is impaired by the Plan. Each holder of an Allowed Tax Priority Claim or an Allowed Wage Priority Claim is entitled to vote to accept or reject the Plan. Proponents estimate there are no creditors in this Class.

(b) <u>Distributions</u>. To the extent there is a holder of a Priority Claim, each holder of an Allowed Tax Priority Claim or an Allowed Wage Priority Claim shall receive one (1) payment six (6) months after the Effective Date. The payment will be 100% of the Allowed Claim.

## CLASS 2 – MID-FIRST BANK SECURED CLAIM.

(a) <u>Impairment and Voting</u>. Class 2 is impaired by the Plan. The holder of the Class 2 Claim is entitled to vote to accept or reject the Plan.

Term: Five (5) years from estimated closing of July 1, 2012 (closing date subject to change).

Loan Amount: $6,500,000 (based on estimated sources and uses – subject to change based on closing date).

Extension Fee: None.

Interest Rate: Floating at one (1) month LIBOR plus 3.00% with a floor rate of 4.00% and a ceiling of 6.00% for years 1 through 5. During the extension period, if granted, the Interest Rate shall be the then-existing two (2) years "swap rate" plus 300 basis points, with a ceiling of 7.00% per annum.

Amortization: Months 1 to 24: Interest only.

Escrows: Impounds for property taxes and insurance to be collected by MidFirst with monthly debt service payments. Escrow balance shall be initially funded as calculated by MidFirst to account for upcoming property tax and insurance payments.

Extension Option: One (1) option of two 92) years, at Borrower's option, but subject to Physcial Property Occupancy of at least 80%, Debt Service Coverage Ratio ("DSCR") of at

5

least 1.20x, Loan-to-Value ("LTV") not to exceed 80%, and one hundred twenty (120) days prior written notice.

Physical Property Occupancy calculated as square footage actually occupied by tenants open for business and paying rent for at least the three months prior to and including the Extension Test Date divided by the total rentable square feet contained in the property.

DSCR calculated as NOI divided by Debt Service. NOI calculated as the actual net operating income for the three months prior to and including the Extension Test Date on an annualized basis. Debt Service calculated as the then actual outstanding Loan Amount as of the Extension Test Date, and interest rate equal to six percent (6%), and 25-year mortgage style amortization.

LTV calculated as the then actual outstanding Loan Amount as of the Extension Test Date divdied by the "as is" value as determined by an appraiser obtained by MidFirst prior to the Extension Test Date and paid for by Borrower.

Extension Test Date shall be the date that is thirty 930) days prior to the initial maturity date. By way of example, if the initial maturity date is June 30, the Extension Test Date would be May 31. For the Physical Property Occupancy test a tenant would qualify to be included if open for business and had paid rent for March, April and May of the same year.

Guarantors: Dough Huberman (and spouse, if any, which can be released upon final divorce), Patrick Chraghchian (and spouse, if any), Joel and diane Leebove, and Joel Leebove, as trustee of the Joel Leebove Trust.

New Cash Equity: Borrower to raise not less than $1,500,000 in new cash equity, which when combined with the $569,929 (estimate) cash collateral currently held at MidFirst, will be used as described in Exhibit A – Sources and Uses. The New Cash Equity shall be funded at closing of the loan modification or confirmation of the Plan. Any funds not utilized at closing will be held at MidFirst as additional collateral until utilized.

Property Taxes: Property Taxes shall be paid current through tax year 2011.

Prepayment Premium: None.

Waiver of Certain Pre- and Post-Petition Costs: If Borrower fully repays the loan, including all accrued and unpaid interest, outstanding costs and fees, and any other charges then due, on or prior to the initial maturity date, MidFirst will waive all Pre-Petition Default Interest ($346,666.67), Pre-Petition Late Fees ($1,533.34), Post-Petition Interest ($98,690 estimate only), Post-Petition Costs and Expenses (to be determined), and Post-Petition Legal Fees (to be determined). If Borrower does not repay the loan infull on or prior to the initial maturity date the foregoing costs will be capitalized to the outstanding loan amount.

Excess Cash Flow: Borrower shall remit one hundred percent (100%) of the excess property cash flow after debt service, other allowed expenses, Plan payments, and an operating account floor (to be determined) to MidFirst within thirty 930) calendar days of each calendar quarter end. Fifty percent (50%) of the amount remitted shall be used to reduce the then

6

outstanding Loan Amount. At Borrower's option, the remaining fifty percent (50%) shall be either (1) placed into the Leasing Reserve to be used for future tenant improvement costs and future leasing commissions, (2) place into a capital reserve for future capital improvements, or 93) used to further reduce the then outstanding Loan Amount.

Other Creditors: Borrower shall make payments to General unsecured Claims, Unsecured Claims of Managing Members and Affiliates, and Housep Adamian Secured Claim as scheduled and described in the Plan or as separately agreed to with Claimants and approved by MidFirst.

Covenant Testing: At the end of Month 24, the property shll support a DSCR of no less than 1.05x.

At the end of Months 36, 48, and 72 (if applicable) the property shall support a DSCR of no less than 1.20x.

If Borrower is not in compliance with the above DSCR tests, or is otherwise in default on the loan beyond the applicable notice and cure periods, the full principal balance shall be immediately due and payable. Borrower shall have one hundred twenty (120) calendar days to cure the DSCR default by either (1) reducing the principal balance of the loan to a level that supports the DSCR test, or (2) bringing the DSCR test back into compliance.

DSCR defined and calculated as noted in Extensio Options except Extension Test Date is delted and replaced with Covenant Test Date, which shall be the last day of the loan Month 24, 36, 48, and 72 (if applicable).

Electronic Sign: Borrower may construct a new electronic sign on the property, subject to (i) collateral assignments to MidFirst of all Borrower's rights, title, and interest in the Electronic Sign, construction documents, warranties, licenses, agreements, approvals, leases, and all other necessary items, (ii) review and approval by MidFirst of the plans, contract, form of lease agreement, permits, and any other pertinent items, and (iii) an appraisal report specific to the Electronic Sign to be provided by Borrower. Should the appraisal not support the Borrower's assumptions or Borrower not construct the Electronic Sign for any reason within 24 months of closing of the modification or confirmation of the Plan, the funds identified for construction of the Electronic Sign will be used to reduce the principal balance of the loan.

Lease Approvals: Leasing by Borrower shall remain subject to the conditions in Section 5.b. of the Loan Agreement dated January 5, 2007 with the following modifications:

(1) Section 5.b.(i) shall be modified to read, "over five thousand square feet (5,000 SF)"

(2) Section 5.b.(iv) shall be added to read, "contain co-tenancy clauses"

(3) MidFirst shall approve or disapprove any lease requiring MidFirst approval within ten (10) business days after its receipt of all required information. If MidFirst does not disapprove within said ten (10-) day period, the lease shall be deemed approved.

7

Borrower has informed Mid First that both Dollar Tree and Aaron's are open for business at the property pursuant to leases that have not yet been approved by MidFirst. MidFirst will consent to these leases in the final loan extension and modification documentation.

Cash Flow and General Reserve: Cash Flow & General Reserve in Exhibit A shall be used for (i) debt service payments to MidFirst, (ii) scheduled payments to Other Creditors according to the Plan or approved separate agreements, (iii) property operating expenses as approved by MidFirst, (iv) deferred maintenance, and (v) emergencies. Funds for items iii, iv, v to be released subject to MidFirst's approval. If MidFirst does not disapprove within ten (10) days then the request for funds shall be deemed approved.

Leasing Reserve: Leasing Reserve in Exhibit A shall be used for future tenant improvement costs and leasing commissions for new leases and renewals and modifications to existing leases. Funds to be released subject to MidFirst's review and approval.

Operating Account: Borrower required to maintain the property operating account at MidFirst.

Dollar Tree Asbestos: Borrower shall provide documentation verifying that the asbestos identified in the Dollar Tree lease is completely remediated to the complete satisfaction of Dollar Tree and MidFirst.

**The Class 2 Claim is impaired and entitled to vote to accept or reject the Plan.**

**CLASS 3A – GENERAL UNSECURED CLAIMS OTHER THAN CLASSES 3B AND 7.**

      (a) <u>Impairment and Voting</u>. Class 3 is impaired by the Plan. Each holder of an Allowed General Unsecured Claim is entitled to vote to accept or reject the Plan.

      (b) <u>Distributions</u>. Each holder of an Allowed General Unsecured Claim shall receive its *pro rata* share of Plan Payments. The Payment(s) to holders of this Class shall be paid in sixty (60) equal monthly payments, the first of which shall be made six (6) months after the Effective Date. Interest shall accrue on these claims at the Federal Judgment Rate.

**CLASS 3B-UNSECURED CLAIMS OF MANAGING MEMBERS AND AFFILIATES**

      Any holder of a Class 3B Claim shall be paid at the rate of $3,000.00 per month for one (1) year, $4,000.00 per month for the second year, and $5,000.00 per month for the third year, and $7,000 per month thereafter until paid in full.

**CLASS 4 – YAVAPAI COUNTY, ARIZONA.**

8

An initial payment of $275,000.00 will be made no later than sixty (60) days after the Effective Date. The holder of this Class has a claim for unpaid real estate taxes in the approximate amount of $345,885.14. Payment will be made over a three (3) year period and will accrue interest at the statutory rate. Payments for the balance due this Class will be made on a quarterly basis, and the first payment will occur three (3) months after the Effective Date. This claim will be paid in full. This Class is impaired and entitled to vote to accept or reject the Plan.

**CLASS 5 – TENANT SECURITY DEPOSITS.**

Any party holding a Security Deposit will receive its deposit at the conclusion of the lease, subject to the terms of the lease. Class 5 is unimpaired.

**CLASS 6 – HOUSEP ADAMIAN SECURED CLAIM.**

This claim will be paid in four (4) equal semi-annual payments, the first of which will be made thirty (30) days after the Effective Date. Interest will accrue on this claim at the rate of 3.25% per annum. This Class is impaired and entitled to vote on the Plan.

**CLASS 7 – UNSECURED CLAIM OF MIDFIRST.**

To the extent MidFirst does not make an 1111(b) election, and it is determined MidFirst has an unsecured claim, the unsecured portion of MidFirst's claim will be paid in five (5) equal annual payments, the first of which will be made six (6) months after the Effective Date. This Class, to the extent it exists, is impaired and entitled to vote on the Plan.

**CLASS 8-NEW VALUE CONTRIBUTIONS**

The Debtor intends to fund the Plan in part by a New Value Contribution in an amount no less than $1,500,000.00. The Use of the monies from the New Value Contribution is set forth in Exhibit 2. The current members of the Debtor will have the first right to make a New Value Contribution in an amount that is pro-rata to their current membership percentage. To the extent any Member(s) choose not to make a New Value Contribution, or there is an insufficient amount raised, the Managing Members will fund the balance necessary to reach $1,500,000.00. The New Value shall be paid a preferred rate of return of eight per cent (8%) *per annum*, and will receive this money as there is sufficient cash flow generated by the Property. In addition, the New Value Contributors shall be paid in full on the sale of the Property, prior to any monies being distributed to Class 9 Members. Upon the sale of the Property, and after payment in full to all other creditors, New Value Contributors shall split the remaining proceeds of sale twenty percent (20%) to the New Value Contributors and eighty percent (80%) to Class 9. New Value Contributors shall have a lien on the Managing Members' twenty-five percent (25%) interest in two (2) separate California entities-35 Raymond LLC and RMB I, LLC.

**CLASS 9 – INTERESTS OF MEMBERS**

(a) Impairment and Voting. Class 9 is impaired by the Plan

(b) Distributions. The holders of Membership Interests shall retain their interests in the Debtor, subject to the Amended Operating Agreement, a copy of which is attached as Exhibit 3. Provided all payments under the Plan are made, Class 9 Members shall receive

9

payments subject to all other Classes being paid in accordance with the treatment set forth in the Plan.

**Voting and Confirmation Procedures**

This Disclosure Statement is accompanied by copies of the following: (a) the Plan, attached as Exhibit 1 to this Disclosure Statement; (b) the Bankruptcy Court's Order: (1) Setting Hearing on Approval of Adequacy of Disclosure Statement and Plan Confirmation; (2) Setting Objection Deadlines thereon; (3) Setting Record Date; (4) Approving Ballots and Solicitation Protocol; (5) Setting Ballot Deadlines; and (6) Related Matters (the "Solicitation Order"); and (c) a Ballot to accept or reject the Plan.

Appropriate forms of Ballots must be used by the holders of Claims in Classes 1, 2, 3A, 4, 6, 7 and 9.

**Who May Vote**

Under the Bankruptcy Code, impaired Classes of Claims are entitled to vote to accept or reject a plan of reorganization. A Class that is not impaired under a plan is deemed to have accepted a plan and does not vote. A Class is impaired under the Bankruptcy Code when the legal, equitable, and contractual rights of the holders of Claims or Equity Interests in that Class are modified or altered. For purposes of this Plan, only holders of Claims in Classes 1, 2, 3, 4, 6, 7 and 9 are entitled to vote on the Plan.

If, however, the Debtor files an objection to your claim, you are responsible to request that the Bankruptcy Court temporarily allow your claim for voting purposes. Rule 3018 of the Federal Rules of Bankruptcy Procedure provides that the Bankruptcy Court after notice and hearing may temporarily allow the Claim in an amount which the Bankruptcy Court deems proper for the purpose of voting. If the Debtor files an objection to your claim, you should seek an attorney's assistance with respect to this matter.

**Voting Instructions**

All votes to accept or reject the Plan must be cast by using the appropriate form of Ballot enclosed with this Disclosure Statement. Only votes using such Ballots will be counted, except to the extent the Bankruptcy Court orders otherwise.

**For your vote to count, your Ballot must be properly completed according to the voting instructions on the Ballot and received no later than the Voting Deadline by the Debtor's counsel. Any Ballot not indicating an acceptance or rejection will be deemed an acceptance of the Plan.**

If you have any questions concerning the Plan, please contact:

Michael W. Carmel, Esq.
Michael W. Carmel, Ltd.
80 East Columbus Avenue
Phoenix, Arizona 85012
Telephone: (602) 264-4965
Facsimile: (602) 277-0144
E-Mail: michael@mcarmellaw.com

**Acceptance or Rejection of the Plan**

10

Under the Bankruptcy Code, a Class of Claims entitled to vote is deemed to have accepted the Plan if it is accepted by creditors in such Class who, of those actually voting on the Plan, hold at least two-thirds in amount and more than one-half in number of the Allowed Claims of such Class.

**Confirmation Hearing; Objections**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a Confirmation Hearing. Section 1128(b) of the Bankruptcy Code provides that any party-in-interest may object to Confirmation of the Plan. Under Section 1128 of the Bankruptcy Code and Rule 3017(c) of the Bankruptcy Rules, the Bankruptcy Court has scheduled the Confirmation Hearing before the Honorable Redfield T. Baum, United States Bankruptcy Judge, at the United States Bankruptcy Court, District of Arizona, 230 North First Avenue, 7th Floor, Phoenix, Arizona 85004 for [**to be inserted after approval of the Disclosure Statement**]  The Solicitation Order setting forth the time and date of the Confirmation Hearing has been included along with this Disclosure Statement. Pursuant to the Solicitation Order, the Confirmation Hearing has been set to consider the adequacy of this Disclosure Statement, as well as to consider Confirmation of the Plan. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of such adjourned hearing date by the Bankruptcy Court in open court at such hearing.

Any objection to the adequacy of this Disclosure Statement or to Confirmation of the Plan must be in writing, must comply with the Bankruptcy Rules and the Local Rules of the Bankruptcy Court, and must be filed and served by **5:00 p.m. (Mountain Standard Time)** on the date as required in the Solicitation Order.

## GENERAL BACKGROUND OF THE DEBTOR

## BACKGROUND AND EVENTS LEADING TO BANKRUPTCY FILING

Verde Valley Plaza, LLC (VVP) an Arizona limited liability company ("Debtor") was formed in 17 October 2006. The purpose of this LLC was to purchase a 104,152 net rentable square footage shopping center at 1501 E. Highway 89A, Cottonwood Arizona.

VVP owns 100% of the existing shopping center. The purchase price of the shopping center was $9,612,990. The Members collectively put in equity at the time of purchase of $4,200,000. These funds were deemed at the time sufficient for purchase money, reserves and the design/entitlement of a major shopping center renovation/expansion. The entitlements for the renovation/11,000 square foot expansion were obtained by the Debtor prior to the onset of the liquidity crisis which made obtaining a construction loan virtually impossible.

The Debtor financed the purchase through Midfirst Bank, securing a loan of $5,947,500 at an interest rate of 6.5%. The appraisal on the shopping center conducted by Midfirst Bank at that time of purchase was high enough to meet the bank's loan to value requirements (exceeding 30% equity). The loan was initially negotiated as a non-recourse debt instrument. After the Debtor had waived its right

11

to terminate the purchase and made initial loan application deposits, MidFirst changed the terms of the loan to include personal guarantees and a $500,000 cash collateral requirement.

At the time of the purchase the property was 100 % occupied with Food City (Basha's) as the grocery anchor tenant with 40,557 square feet. At the time, Basha's was a large grocery chain of approximately 158 locations throughout the State of Arizona. Three additional credit tenants included Sears, H&R Block and Pizza Hut with a total of 19,113 square feet. The remaining 42.7% of occupied space was occupied by locally owned businesses.

The real estate market seemed to be fairly steady for the rest of 2007 and into 2008. In mid 2008 the real estate market started to collapse and the Debtor lost Home Furnishings in August of 2008 (19,612 square feet). However, the biggest blow was the bankruptcy filing of Food City in July of 2009. This occurred while Debtor was in discussions with MidFirst regarding Modifying/Extending the loan. The damage done by the bankruptcy occurred in three ways. First, MidFirst ceased negotiations of the loan modification/extension pending the outcome of the bankruptcy. Second, uncertainty regarding the anchor's future which caused small tenants to begin renegotiating leases for lower rents. And the third was the result of Midfirst insisting that Ownership obtain an early declaration from Basha's whether they were going to reject or accept the lease. This request for clarification was made over the objections of Debtor. Debtor's objections being based upon the fact that requesting an early declaration of Basha's intent could only have a negative impact on the intent on the center.

1. If Basha's was going to reject, they would simply do so earlier than they would have otherwise planned, thereby reducing the center's income and the time available to explore alternative tenancies with income still coming in.

2. And, if they were intending to stay, telling them that we had to know their intent right away would convey desperation on our part and invite significant concessions and the renegotiation of the lease.

It turned out that the latter was the case and roughly $400,000 in rent concessions were granted to Basha's in order to obtain their written confirmation (in the form of the 2nd Amendment to Lease). This included reducing Basha's Annual Base Rent from $94,500 to a virtually free Annual Base Rent of $4,500 in Year 1, $15,600 in Year 2, $25,596 in Year 3, $35,592 in Year 4 and $45,600 in Year 5 plus waiving tens of thousands of Pre-Petition claims including back real

12

estate taxes. This reduced cash flow available to meet debt service, the NOI and the value of the center significantly. Basha's annual rent will not return to $94,500 until January 1, 2015.

Throughout this period Debtor was in discussions with MidFirst Bank regarding an Loan Extension/Modification. At issue was a "Catch 22" where MidFirst was unwilling to do any of the following:

1) Release a portion of the $560,000 in cash collateral to pay tenant improvements and commissions for 26,000 square feet of new national credit tenants that wanted to open stores in the center (Big 5, Aaron Rents and Dollar Tree) or

2) Extend the loan long enough that Debtor's investors would feel comfortable funding the TI and Commissions.

Debtor's arguments supporting #1 above was two-fold. First, that the leasing interest by the national credit tenants in the center was time sensitive and it was unlikely that the tenants would wait indefinitely for Debtor and MidFirst to complete their loan extension/modification negotiations. If leases were not negotiated expeditiously, either the tenants would lose interest completely or their real estate committees would reduce their offers. And second, it was in all the parties' interest to maintain and increase the value of the real estate securing the bank's loan. The income from the three national tenants would have increased the NOI by more than $350,000 a year and, assuming a 8.5 CAP valuation, would have increased the value of the center by more than $4 million. This increase in value would have assured a value of the center in excess of the debt and made it likely that Debtor would have been able to refinance and pay off MidFirst completely.

Debtor's argument supporting #2 above was singular. No prudent investor was going to write checks for new tenant improvements and commissions in the center unless it was clear that the property was not facing impending foreclosure. Extending the loan on exactly the same terms and conditions would have left the bank absolutely no worse off and would have given the investors the assurance that their investment would not have simply been a cash transfer from them to the bank.

Much to the Debtor's surprise and consternation, MidFirst declined to do either #1 or #2 above and, as a result, Big 5 Sporting Goods walked away (resulting in a loss of $175,000 in potential annual income) and the Aaron Rents and Dollar Tree leases had to be renegotiated at significantly lower rents and signed over

13

MidFirst's objections (their position was that vacant space is better than space occupied with a co-tenancy provision) in order to convince the Tenants to pay for their own tenant improvements and except repayment in the form of free rent. Additionally, exchanging free rent credits and low rents per square foot for no/low TI deals was necessary to consummate the 7,100 square feet of new leases signed in the last month. As a result, combined with the Basha's concessions driven by the demand for an early rejection/ratification of the lease have driven a wedge between the physical and economic occupancy of the center. Of the center's 104,000 square feet, more than 63,000 s.f. are occupied by tenants that are not paying all or most of their base rent due to concessions made necessary by the MidFirst's unwillingness to either extend the loan or use cash collateral to pay for tenant improvements. Add to this the 10,000 square feet of occupancy lost when Big 5 walked away and 73,000 square feet (over 70%) of the center's current economic underperformance could have been avoided had the bank taken affirmative action when appropriate and restrained itself from forcing the debtor into a position where massive economic concessions to Basha's were a certainty.

**Post-Petition Operations**

Since the Petition Date, the Debtor has continued to operate the business as a "debtor-in-possession" under Sections 1107(a) and 1108 of the Bankruptcy Code. The Debtor has not required any Post-Petition Debtor-in-Possession financing. The Debtor continues to operate the Plaza.

**Retention of Professionals**

On December 6, 2011, the Bankruptcy Court entered an order authorizing the Debtor to retain Michael W. Carmel, Ltd. as bankruptcy and reorganization counsel. No other professionals have been employed.

**Bar Date for Filing Proofs of Claims**

The Debtor will be filing a Motion requesting the Court enter an Order establishing a Bar Date to file proofs of claim. A separate Notice will be sent to all creditors and parties-in-interest when the Bar Date is established.

**Debtor's Assets**

The Debtor's Bankruptcy Schedules reflect assets of $6,033,767.88. The Debtor has analyzed the values of the Property, and believes an appropriate market value at this time is $6,000,000.00.

The Debtor's Bankruptcy Schedules reflect liabilities of approximately $7,297,786.74.

**DESCRIPTION OF THE PLAN OF REORGANIZATION**

As previously noted, a copy of the Plan accompanies this Disclosure Statement as **Exhibit 1**.

14

The following summary of the material provisions of the Plan is qualified in its entirety by the specific provisions of the Plan, including the Plan's definitions of certain terms used below. The following is intended to provide a general description of the Plan. For more specific information, please refer to the Plan itself. The Debtor has attempted to minimize the use of defined terms in describing the Plan. However, any capitalized terms that are not defined in this section of the Disclosure Statement are defined in the Plan. It is recommended that one refer to those definitions when reading this document.

**Brief Explanation of Chapter 11 Reorganization**

The Debtor is being reorganized pursuant to the Plan that is proposed under Chapter 11 of the Bankruptcy Code ("Chapter 11"). Under Chapter 11, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and equity holders. Confirmation of a Plan of Reorganization is the principal objective of a Chapter 11 case.

In general, a Chapter 11 Plan of Reorganization (a) divides Claims into separate Classes; (b) specifies the property that each Class is to receive under the Plan; and c) contains other provisions necessary to the reorganization of the Debtor. A Chapter 11 Plan of Reorganization may provide that certain Classes of Claims are either: (i) to be paid in full upon the effective date of the plan; (ii) reinstated; or (iii) their legal, equitable and contractual rights are to remain unchanged by the reorganization or liquidation effectuated by the plan. These Classes are referred to under the Bankruptcy Code as unimpaired and, because of such favorable treatment, are deemed to accept the plan. Accordingly, it is not necessary to solicit votes from the holders of Claims in such unimpaired Classes. A Chapter 11 plan may also provide that certain Classes will not receive any distributions of property. Such Classes are deemed to reject the plan.

**All other Classes of Claims contain impaired Claims. An impaired Class is generally a Class which will receive something less than their Claim under the plan of reorganization. Before a plan can be confirmed by the Bankruptcy Court, Chapter 11 generally requires that each impaired Class of Claims votes to accept a plan. Acceptances must be received from the holders of Claims constituting at least two-thirds in dollar amount and more than one-half in number of the allowed Claims in each impaired Class of Claims that have voted on the plan. However, even if an impaired Class rejects the plan, the Bankruptcy Court may confirm the plan if certain minimum treatment standards are met with respect to such Class or Classes. This is discussed in this Disclosure Statement under the Section heading "Confirmation Without Acceptance by All Impaired Classes". Classes that receive nothing are deemed to reject the Plan.**

Chapter 11 does not require each holder of a Claim to vote in favor of a plan of reorganization in order for the Bankruptcy Court to confirm the Plan. However, the Bankruptcy Court must find that the Plan meets a number of tests (other than the voting requirements described in this section) before it may confirm, or approve, the Plan. Many of these tests are designed to protect the interests of holders of Claims who do not vote to accept the Plan but who will nonetheless be bound by the Plan's provisions if it is confirmed by the Bankruptcy Court.

**Preserved Claims**

The Debtor believes it may have a lender liability claim against MidFirst. It is in the process of investigating this potential claim. Any claim(s) against MidFirst is preserved for post-confirmation litigation.

15

**Solicitation of Acceptance of the Plan**

The Debtor is seeking acceptances of the Plan from holders of Allowed Claims classified in Classes 1, 2, 3, 4, 6 and 7 which are the only Classes entitled to vote under the Plan. Class 1 is deemed to accept the Plan. If the requisite acceptances are received, the Debtor will use the acceptances as evidenced by the Ballots solicited in connection with this Disclosure Statement and the Solicitation Order to seek confirmation of the Plan under Chapter 11.

If any impaired Class is determined to have rejected the Plan in accordance with Section 1126 of the Bankruptcy Code, the Debtor may use the provisions of Section 1129(b) of the Bankruptcy Code to satisfy the requirements for confirmation of the Plan.

The Debtor believes that its Plan complies with applicable bankruptcy and non-bankruptcy law. The Debtor believes this Disclosure Statement contains adequate information for all holders of Impaired Claims to cast an informed vote to accept or reject the Plan. Furthermore, the Debtor believes the holders of Impaired Claims will obtain a greater recovery under the Plan than they would otherwise obtain if the Debtor's assets were immediately liquidated under Chapter 7 of the Bankruptcy Code.

If the Plan is confirmed by the Bankruptcy Court, each holder of an Impaired Allowed Claim will receive the same pro-rata consideration as other holders of Claims in the same Class, whether or not such holder voted to accept the Plan. Moreover, upon Confirmation, the Plan will bind all Creditors regardless of whether or not such Creditors voted to accept the Plan.

**Classification of Claims and Equity Interests**

Section 1123 of the Bankruptcy Code provides that a plan of reorganization must classify Claims against a debtor. Under Section 1122 of the Bankruptcy Code, a plan must classify Claims into Classes that contain substantially similar Claims. The Plan divides the Claims of known Creditors into Classes and sets forth the treatment offered each Class. The Debtor believes it has classified all Claims in compliance with the provision of Section 1122 of the Bankruptcy Code, but it is possible that a Creditor may challenge such classification of Claims and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. If so, the Debtor intends, to the extent permitted by Bankruptcy Code and the provisions of the Plan, to amend or revoke the Plan and file an amended or different Plan that would make modifications to the classification of Claims required by the Bankruptcy Court for confirmation.

The Classes under the Plan take into account the differing nature and priority of Claims against the Debtor. Section 101(5) of the Bankruptcy Code defines Claim as a right to payment, whether or not such right is reduced to judgment, liquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured. A Claim against the Debtor also includes a Claim against the Debtor's property as provided in Section 102(2) of the Bankruptcy Code.

For the holder of a Claim to participate in a reorganization plan and receive the treatment offered to the Class in which it is classified, its Claim must be Allowed. Under the Plan, an Allowed Claim is defined as a Claim: (a) proof of which, requests for payment of which, or application for allowance of which, was filed or deemed filed on or before the Bar Date, Administrative Claim Bar Date, or the Professional Fee Bar Date, as

16

applicable, for filing proofs of claim or requests for payment of claims of such type against the Debtor; (b) if no proof of claim is filed, which has been or is ever listed by the Debtor in the Schedules as liquidated in amount and not disputed or contingent; or c) a Claim that is allowed in any contract, instrument, indenture, or other agreement entered into in connection with the Plan and, in any case, a Claim as to which no objection to its allowance has been interposed within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court. Any Claim to which an Objection is filed is not an allowed claim until a court of competent jurisdiction has entered a final, no-appealable order. As previously noted, the Debtor will be filing an objection to any claim filed by the Victor Parties.

**Implementation of the Plan**

The Debtor shall be responsible for administering and implementing the Plan, including, but not limited to making Distributions pursuant to the Plan. The entity will receive an infusion of additional capital in the form of a New Value Contribution. The New Value Contribution is anticipated to be no less than $1,500,000.00. **Exhibit 2** provides an itemization of the proposed Uses of the New Value. The debtor has also compiled a budget of estimated revenues and expenses. There are two (2) separate sets of projections attached to this disclosure statement. The first is identified as **Exhibit 3**. These projections are a month-by-month breakdown for the first three (3) years. The second set of projections is marked as **Exhibit 4**, and is annualized over a seven (7) year period.

**Management of the Reorganized Debtor**

Subject to the provisions of the Plan, and in accordance with Section 1123(b)(3)(B) of the Bankruptcy Code, Doug Huberman is the designated representative of the Reorganized Debtor. Subject to the provisions of the Plan, Mr. Huberman will have the power to take any and all such actions as are, in his judgment, necessary to fulfill its obligations under the Plan. The debtor is going to operate under a proposed Amended Operating Agreement, a copy of which is attached as **Exhibit 5**.

**Distributions**

On the Distribution Date, or as soon thereafter as practical, the Debtor shall effect a Distribution to holders of Allowed Claims that, as of the date of the Distribution, have not otherwise been paid or satisfied in accordance with the Plan.

**Limitations on Officers' and Directors' Liability**

Subject to applicable law, no Officer, Director or Creditors' Committee Member shall be liable for any act or omission in carrying out the Plan except for such act or omission arising from such Person's gross negligence, willful fraud or other willful misconduct.

17

**Description of Other Provisions of the Plan**

**Executory Contracts**

The Debtor will move to assume executory contracts it wishes to keep as a Reorganized Debtor before the confirmation hearing. All other contracts will be rejected under the Plan. Parties to rejected contracts may file proofs of claim for damages within 30 days after the Confirmation Order is entered. If they fail to do so, any such claims will be barred and extinguished.

**Post-Effective Date Distributions**

Distributions made after the Effective Date to holders of Claims that are not Allowed Claims as of the Effective Date, but which later become Allowed Claims, shall be deemed to have been made on the Effective Date. Notwithstanding any provision in any contract or other document that may relate to a Claim, all Distributions made pursuant to the Plan shall be made as if paid on the Initial Distribution Date, without the additional accrual of interest, fees or penalties.

**Discharge**

Except as provided in the Plan or the Confirmation Order, the rights afforded under the Plan and the treatment of Claims under the Plan are in exchange for and in complete satisfaction, discharge, and release of, all Claims including any interest accrued on Administrative Expense Priority Claims and General Unsecured Claims from the Petition Date. Except as provided in the Plan or the Confirmation Order, confirmation of the Plan: (a) discharges the Debtor from all Claims or other debts that arose before the Confirmation Date, and all debts of the kind specified in Sections 502(g), 502(h) or 502(I) of the Bankruptcy Code, whether or not: (i) a proof of claim based on such debt is filed or deemed filed under Section 502 of the Bankruptcy Code; (ii) a Claim based on such debt is Allowed under Section 502 of the Bankruptcy Code; or (iii) the holder of a Claim based on such debt has accepted the Plan.

**Injunction**

Except as provided in the Plan or the Confirmation Order, as of the Confirmation Date, all entities that have held, currently hold or may hold a Claim or Interest or other debt or liability that is discharged are permanently enjoined from taking any of the following actions on account of any such discharged Claims, debts or liabilities: (a) commencing or continuing in any manner any action or other proceeding against the Debtor (including any officer or director acting as a representative of the debtor) or property of the Debtor; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtor or property of the Debtor; (c) creating, perfecting, or enforcing any lien or encumbrance against the Debtor or property of the Debtor, including; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability, or obligation due to the Debtor; and (e) commencing or continuing any action, in any manner, in any place, that does not comply with or is inconsistent with the provisions of the Plan or the Bankruptcy Code.

18

**Preservation of Insurance**

The Debtor's discharge and release from Claims as provided in the Plan, except as necessary to be consistent with the Plan, do not diminish or impair the enforceability of any insurance policy that may cover Claims against the Debtor or any other Person.

**Section 1146 Exemption**

In accordance with Section 1146(c) of the Bankruptcy Code: (a) the distribution, transfer, or exchange of Estate property; (b) the creation, modification, consolidation, or recording of any deed of trust or other security interest, the securing of additional indebtedness by such means or by other means in furtherance of, or connection with, the Plan or the Confirmation Order; (c) the making, assignment, modification, or recording of any lease or sublease; or (d) the making, delivery, or recording of a deed or Order, or any transaction contemplated above, or any transactions arising out of, contemplated by, or in any way related to, the foregoing shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act or real estate transfer act, mortgage recording tax or other similar tax or governmental assessment and the appropriate state or local government officials or agents shall be directed to forego the collection of any such tax or assessment and to accept for filing or recordation any of the foregoing instruments or other documents without payment of any such tax or assessment.

**Withholding and Reporting Requirements**

In connection with the Plan and all instruments issued in connection with the Plan, the Debtor shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all Distributions under the Plan remain subject to any such withholding and reporting requirements. The Debtor shall be authorized to take all actions necessary to comply with such withholding and recording requirements. Notwithstanding any other provision of the Plan, each holder of an Allowed Claim that has received a Distribution of Cash, shall have sole and exclusive responsibility for the satisfaction or payment of any tax obligation imposed by any governmental unit, including income, and other tax obligation on account of such Distribution. For tax purposes, Distributions received in respect of Allowed Claims will be allocated first to the principal amount of such Claims, with any excess allocated to unpaid accrued interest.

**Full and Final Satisfaction and Penalties and Fines**

In accordance with the Plan, all payments and all distributions are in full and final satisfaction, settlement, release, and discharge of all Claims and Equity Interests, except as otherwise provided in the Plan.

Except as expressly provided for in the Plan, no distribution shall be made under the Plan on account of, and no Allowed Claim (whether Secured, Unsecured, Priority or Administrative) shall include any find, penalty, or exemplary or punitive damages relating to or arising from any default or breach by the debtor, and any claim on account of such fine, penalty, or exemplary or punitive damages shall be deemed to be disallowed, whether or not an objection is filed to such Claim.

**Impaired Classes to Vote**

Each holder of a Claim in an impaired Class shall be entitled to vote separately to accept or reject the Plan unless such holder is deemed to reject the Plan.

19

**Acceptance by Class of Creditors and Holders of Interest**

An impaired Class of holders of Claims shall have accepted the Plan if the Plan is accepted by at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims of such Class that have voted to accept or reject the Plan. A class of holders of Claims shall be deemed to accept the Plan in the event that no holder of a Claim within that Class submits a Ballot by the Voting Deadline.

**Cramdown**

If any impaired Class of Claims entitled to vote does not accept the Plan by the requisite statutory majorities provided in Section 1126(c) or 1126(d) of the Bankruptcy Code as applicable, or if any impaired Class is deemed to have rejected the Plan, the Debtor reserves the right to request that the Bankruptcy Court confirm the Plan under Section 1129(b) of the Bankruptcy Code and to amend the Plan, in accordance with the applicable provisions of the Plan governing amendments or modifications, to the extent necessary to obtain entry of the Confirmation Order.

**Disbursement of Funds**

Any payment of Cash required to be made under the Plan will be made by check drawn on a domestic bank or by wire transfer from a domestic bank at the election of the Person making such payment. Any payment or distribution required to be made under the Plan on a day other than a Business Day will be made on the next succeeding Business Day, without interest.

From and after the Effective Date, the Debtor may litigate to Final Order, propose settlements of, or withdraw objections to, all pending or filed Disputed Claims or Litigation Claims and may settle or compromise any Disputed Claim or Litigation Claim without notice and a hearing and without approval of the Bankruptcy Court.

**Retention of Jurisdiction**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court retains broad jurisdiction over the Chapter 11 case after the Effective Date, to the extent legally permissible.

**Amendment of the Plan**

20

At any time before the Confirmation Date, the Debtor may alter, amend, or modify the Plan under Section 1127(a) of the Bankruptcy Code provided that such alteration, amendment, or modification does not materially or adversely affect the treatment and rights of holders of Claims or Interests under the Plan. After the Confirmation Date and before substantial consummation of the Plan as defined in Section 1101(2) of the Bankruptcy Code, the Debtor may, under Section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, and such matters as may be necessary to carry out the purposes and effects of the Plan so long as such proceedings do not materially and adversely affect the treatment of holders of Allowed Claims under the Plan; provided, however, that prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or applicable order of the Bankruptcy Court.

## Revocation or Withdrawal of the Plan

The Debtor reserves the right to revoke or withdraw the Plan at any time before the Confirmation Date. If the Plan is withdrawn or revoked, then the Plan shall be deemed null and void and nothing contained in the Plan shall be deemed a waiver of any Claims by or against the Debtor or any other person in any further proceedings involving the Debtor or an admission of any sort, and the Plan and any transaction contemplated by the Plan shall not be admitted into evidence in any proceeding.

## Post-Confirmation Fees

The Debtor will be responsible for the payment of any fees payable to the Office of the United States Trustee for the Debtor after Confirmation, consistent with applicable provisions of the Bankruptcy Code, Bankruptcy Rules, and 28 U.S.C. Section 1930(a)(6). The Debtor plans to seek an order closing the case as soon as it is substantially consummated, without the burden of ongoing fees assessed against all the Reorganized Debtor's expenditures.

The Debtor estimates that it will incur no more than $50,000 in attorneys' fees to implement the Plan, once it is confirmed. These fees would be incurred primarily to represent the debtor on any appeals as well as claims objections.

## Conditions to Confirmation and Effective Date

***Conditions to Confirmation***. The following are conditions precedent to confirmation of the Plan:

- The Bankruptcy Court shall have entered a Final Order approving the Disclosure Statement with respect to the Plan;

- The Confirmation Order has been entered in form and substance reasonably acceptable to the Debtor and the Creditors' Committee, and contains specific provisions as set forth in the Plan.

- Conditions to Effectiveness: The following are conditions precedent to the : occurrence of the Effective Date:

  - The Confirmation Date has occurred;

21

- The Confirmation Order is a Final Order, except that the Debtor reserves the right to cause the Effective Date to occur notwithstanding the pendency of an appeal of the Confirmation Order, under circumstances that would render moot such an appeal;

- No request for revocation of the Confirmation Order under Section 1144 of the Bankruptcy Code has been made, or, if made, remains pending;

- The Bankruptcy Court, in the Confirmation Order, has approved the retention of jurisdiction provisions of the Plan; and

- All documents necessary to implement the transactions contemplated by the Plan are made in form and substance reasonably acceptable to the Debtor and the Creditors' Committee.

- *Waiver of Conditions*. The conditions to confirmation and the Effective Date may be waived in whole or in part by the Debtor at any time without notice, an order of the Bankruptcy Court, or any further action other than proceeding to confirmation and consummation of the Plan.

- 

## ACCEPTANCE AND CONFIRMATION OF THE PLAN

The following is a brief summary of the provisions of the Bankruptcy Code relevant to acceptance and confirmation of a plan of reorganization. Holders of Claims are encouraged to review the relevant provisions of the Bankruptcy Code with their own attorneys.

### Acceptance of the Plan

This Disclosure Statement is provided in connection with the solicitation of acceptances of the Plan. The Bankruptcy Code defines acceptance of a plan of reorganization by a Class of Claims as acceptance by holders of at least two-thirds (2/3) in dollar amount, and more than one-half (1/2) in number, of the Allowed Claims of that Class that have actually voted or are deemed to have voted to accept or reject a plan. The Bankruptcy Code defines acceptance of a plan of reorganization by a Class of interests as accepted by at least two-thirds in amount of the allowed interests of that Class that have actually voted or are deemed to have voted to accept or reject a plan.

If one or more impaired Classes reject the Plan, the Debtor may, in its discretion, nevertheless seek confirmation of the Plan if the Debtor believes that the requirements of Section 1129(b) of the Bankruptcy Code for Confirmation of the Plan (which are summarized below) will be met, despite the lack of acceptance by all Impaired Classes.

22

## Confirmation

### Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of a plan. Notice of such hearing is being provided to all known holders of Claims or Interests or their respective representatives along with this Disclosure Statement. The hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at such hearing or any subsequent adjournment thereof.

Section 1128 (b) of the Bankruptcy Code provides that any party-in-interest may object to confirmation of a plan. Any objection to confirmation of the Plan must be in writing, must conform with the Bankruptcy Rules and the Local Rules of the Bankruptcy Court, must set forth the name of the objecting party, the nature and amount of Claims or Equity Interests held or asserted by that party against the Debtor's Estate or property, and the specific basis for the objection. Such objection must be filed with the Bankruptcy Court, with a copy forwarded directly to the chambers of the Honorable Randolph J. Haines, together with a proof of service, and served on all parties and by the date set forth on the notice of the confirmation hearing in accordance with the Local Rules of the Bankruptcy Court.

### Statutory Requirements for Confirmation of the Plan

At the confirmation hearing, the Debtor will request the Bankruptcy Court determine that the Plan satisfies the requirements of Section 1129 of the Bankruptcy Code. If the Bankruptcy Court so determines, the Bankruptcy Court will enter an order confirming the Plan. The applicable requirements of Section 1129 of the Bankruptcy Code are as follows:

- The Plan must comply with the applicable provisions of the Bankruptcy Code;

- The Debtor must have complied with the applicable provisions of the Bankruptcy Code;

- The Plan must have been proposed in good faith and not by any means forbidden by law;

- Any payment made or promised to be made by the Debtor under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Case, or in connection with the Plan, must have been disclosed to the Bankruptcy Court, and any such payment made before Confirmation of the Plan must be reasonable, or if such payment is to be fixed after Confirmation of the Plan, such payment must be subject to the approval of the Bankruptcy as reasonable;

- The Debtor must have disclosed the identity and affiliates of any individual proposed to serve, after Confirmation of the Plan, as a director, officer, or voting trustee of the Debtors under the Plan. Moreover, the appointment to,

23

or continuance in, such office of such individual, must be consistent with the interests of holders of Claims and with public policy, and the Debtor must have disclosed the identity of any insider that the Debtor will employ or retain, and the nature of any compensation for such insider;

- Best Interests of Creditors Test: With respect to each Class of Impaired Claims, either each holder of a Claim of such Class must have accepted the Plan, or must receive or retain under the Plan on account of such Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount such holder would receive or retain if the Debtor was liquidated on such date under Chapter 7 of the Bankruptcy Code. In a Chapter 7 liquidation, creditors and interest holders of a debtor are paid from available assets generally in the following order, with no lower Class receiving any payments until all amounts due to senior Classes have either been paid in full or payment in full is provided for: (i) first to secured creditors (to the extent of the value of their collateral); (ii) next the Chapter 7 trustee's and his attorney's fees and expenses, and other liquidation costs; (iii) next to priority creditors; (iv) next to unsecured creditors; (v) next to debt expressly subordinated by its terms or by order of the Bankruptcy Court; and (vi) last to holders of equity interests. The Debtor's best estimates of values of assets and liabilities are set forth herein. The debtor has attached a Liquidation Analysis which it believes satisfies the best Interests of Creditors test.

- Each Class of Claims must have either accepted the Plan or not be Impaired under the Plan;

  - Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Allowed Administrative and Priority Claims (other than Allowed Priority Tax Claims) will be paid in full on the Effective Date and that Allowed Priority Tax Claims will receive on account of such Claim's deferred Cash payment, over a period not exceeding six years after the date of assessment of such Claim, of a value, as of the Effective Date, equal to the Allowed amount of such Claim; and

    - At least one Impaired Class of Claim must have accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim of such Class.

**Confirmation Without Acceptance by All Impaired Claims**

24

Section 1129(b) of the Bankruptcy Code allows a Bankruptcy Court to confirm a plan, even if such plan has not been accepted by all impaired Classes entitled to vote on such plan, provided that such plan has been accepted by at least one Impaired Class. If any Impaired Classes reject or are deemed to have rejected the Plan, the Debtor reserves its right to seek the application of the requirements set forth in Section 1129(b) of the Bankruptcy Code for Confirmation of the Plan despite the lack of acceptance by all Impaired Classes.

Section 1129(b) of the Bankruptcy Code provides that notwithstanding the failure of an Impaired Class to accept a plan of reorganization, the plan must be confirmed, on request of the plan proponent (in a procedure commonly known as **Cramdown**), so long as the plan does not discriminate unfairly and is fair and equitable with respect to each Class of Impaired Claims or Interests that has not accepted the plan.

The condition that a plan by  fair and equitable  with respect to a rejecting Class of Secured Claims includes the requirements that (a) the holders of such Secured Claims retain the liens securing such Claims to the extent of the allowed amount of the Claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan, and (b) each holder of a Secured Claim in the Class receives deferred cash payments totaling at least the allowed amount of such Claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

The condition that a plan be fair and equitable with respect to a rejecting Class of Unsecured Claims or a rejecting Class of Interests includes the requirement that either (a) such Class receive or retain under the plan property of a value as of the effective date of the plan equal to the allowed amount of such Claim or Interest, as the case may be, or (b) if the Class does not receive such amount, no Class junior to the non-accepting Class will receive a payment distribution under the plan.

## CERTAIN INCOME TAX CONSEQUENCES

**SUBSTANTIAL UNCERTAINTY EXISTS WITH RESPECT TO THE TAX CONSEQUENCES OF THE PLAN. NO RULINGS HAVE BEEN REQUESTED FROM THE INTERNAL REVENUE SERVICE WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN. THE TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN MANY AREAS, UNCERTAIN. THEREFORE, EACH HOLDER OF A CLAIM IS STRONGLY URGED TO CONSULT HIS OWN TAX ADVISOR REGARDING SUCH FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES.**

## RISK FACTORS

In this section, the Debtor has attempted to identify the potential material risks of the Plan. **CREDITORS SHOULD CONSIDER CAREFULLY THE FOLLOWING FACTORS, IN ADDITION TO THE OTHER INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, BEFORE SUBMITTING A VOTE TO ACCEPT OR REJECT THE PLAN.**

### Fluctuations in the Value of Debtor's Business

The current value assigned to the Debtor's assets is uncertain, may not remain constant, and may decline over time due to a variety of factors including a downturn in the general economy of the United States or the economics of the potential customers of the Debtor. A disruption or continued downturn in the economy could make it more difficult,

25

or impossible, for the Debtor's product to be sold at a favorable price. In addition, the projections on which these valuations are based could also prove to be incorrect. It is important to remember that the value assigned to a business is in many cases difficult to predict and involve uncertainty.

**Risk of Non-Confirmation of the Plan**

Although the Debtor believes the Plan will satisfy all requirements necessary for confirmation by the Court, there can be no assurance that the Court will reach the same conclusion. Amendments to the Plan may also be required by the Court for confirmation, and these amendments could adversely affect the Creditors' rights to receive distributions under the Plan. Any amendment may also necessitate the re-solicitation of votes. If the Plan is not confirmed, a fire sale (i.e., immediate liquidation) of the Debtor's assets may occur. While a fire sale of the Debtor's assets would likely yield less than the value of the business as a going concern in accordance with the Plan, the range of estimated recoveries in either case is subject to variation based upon market conditions and other factors that are beyond the Debtor's control.

## ALTERNATIVES TO THE PLAN

If the Plan is not timely confirmed, the most likely alternative is either (1) a sale of the debtor's assets, or (2) a Chapter 7 liquidation proceeding. A sale is fraught with a multitude of issues, such as the lease of where the debtor currently conducts its operations, and the lease of a substantial amount of the debtor's equipment. In a Chapter 7 liquidation proceeding, a Chapter 7 trustee would be appointed by the Bankruptcy Court to oversee the liquidation of the Debtor's assets. Such trustee would be entitled to retain a new set of professionals, including lawyers and accountants, to review and analyze all of the Claims and the Debtor's assets. In addition, the Chapter 7 trustee would be entitled to request a fee equal to 3% of all distributions made to the Creditors. The Debtor believes that the conversion to a Chapter 7 liquidation proceeding and the appointment of a new trustee and new estate professionals would substantially increase professional fees and result in further delays and a reduction in distributions. A copy of the Liquidation Analysis is attached as **Exhibit 6.**

The Debtor has explored various alternative scenarios, including the scenarios described above, and believes the Plan enables the holders of Claims to realize the maximum recovery under the circumstances. The Debtor believes the Plan is the best plan that can be proposed and serve the best interests of the Debtor and other parties-in-interest.

## RECOMMENDATION AND CONCLUSION

The Debtor has analyzed different scenarios and believes the Plan will provide the opportunity for the Debtor. In this manner the business will move forward and create value. Any alternative other than confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in potentially less successful emergence from bankruptcy and ultimately liquidation. Accordingly, the Debtor recommends confirmation of the Plan and urge all holders of Impaired Claims to vote to accept the Plan and to indicate acceptance by returning their Ballots so as to be received by no later than the Voting Deadline.

26

RESPECTFULLY SUBMITTED this 5th day of July, 2012.

**VERDE VALLEY PLAZA, LLC**


By: /s/ Douglas Huberman_____
        Douglas Huberman,
         Managing Member

9997-004/LEW/TRS/365701